```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF IOWA
                       CENTRAL DIVISION
```

| | |
|---|---|
| MAHENDRA M. PATEL, ) | |
| ) | No. 4:11-cv-00094-JAJ-RAW |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | FOLLOWING EVIDENTIARY |
| IOWA DEPARTMENT OF ) | HEARING |
| CORRECTIONS; DANIEL CRAIG; ) | |
| JOHN FAYRAM; CALVIN YODER and ) | |
| KAY KOPATICH, ) | |
| ) | |
| Defendants. ) | |

Plaintiff Patel sued the Iowa Department of Corrections ("IDOC") and Daniel Craig, the warden at the Iowa Medical and Classification Center ("IMCC"); John Fayram, the warden at Anamosa State Penitentiary ("ASP"); Calvin Yoder, the prison chaplain at IMCC; and Kay Kopatich, the former religious coordinator for the IDOC, alleging defendants had not accommodated his Hindu religious dietary needs. His suit is based on the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-1, *et seq.*[1] Mr. Patel seeks damages and a mandatory injunction that he be provided a diet in conformity with his religious beliefs. (*See* Tr. [27] at 3-4). Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1343(a)(3), and (4). This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[1] At the outset of the evidentiary hearing it was clarified that Mr. Patel's claim is solely under RLUIPA. (Tr. [27] at 3).

Evidentiary hearing was held at IMCC on July 10, 2012. Plaintiff was represented by attorney Patrick Ingram. Defendants were represented by Assistant Iowa Attorney General William Hill. The parties submitted post-hearing briefs. The matter is fully submitted.

## I.

## FINDINGS OF FACT

Mahendra M. Patel is an inmate at IMCC, having entered the custody of the IDOC in 2006. Mr. Patel is a sincere adherent of the Bochasanwasi Shree Akshar Purushottam Swaminarayan ("BAPS") sect of the Hindu religion. According to Mr. Patel one important practice of that sect is adherence to a vegetarian diet which excludes all things which have been killed. (Tr. [27] at 61). Therefore, Mr. Patel does not eat meat, eggs or fish. Onions and garlic are also prohibited. The food which he eats cannot be prepared using cookware and utensils which have been used to cook, store or handle meat, onions or garlic. (*Id.* at 8; Ex. 1). Sterilizing the cookware does not rid it of what was referred to in the record as "cross-contamination." (*Id.* at 66-67). Mr. Patel has adhered to his BAPS diet since birth. His mother and grandfather were BAPS adherents. (*Id.* at 11).

Mr. Patel's religious dietary needs are complicated by his diabetes, a diagnosis made after he entered the custody of IDOC. (Tr. [27] at 17). Because of his diabetic condition, he also needs snacks during the day. (*Id.*)

No other practices of Mr. Patel's religion are at issue as he agreed at hearing he has adequate opportunity to pray, meditate and possess religious items.

The institutions in the IDOC order their food from a central warehouse and work off a standard menu. (Tr. [27] at 76, 93). Each facility has its own food services department which prepares food for the entire institution, including staff. Greg Ort, deputy warden at IMCC, estimated on an average day the food services department at IMCC serves approximately 3,300 meals. (*Id.* at 75-76). IDOC institutions are required to meet standard nutritional requirements for adults. (*Id.* at 85). IMCC has a standard daily menu and alternatives for special diets. Special diets include those for medical reasons, those for persons on limited activity notice, and religious diets. (*Id.* at 76). For example, with respect to the latter, IMCC attempts to accommodate kosher diets and Muslim diets by making vegetarian diets and no-pork meal options available. (*Id.* at 76).

IMCC does not have the facilities or equipment to prepare vegetarian diets separately from the standard menu, *i.e.*, the same cookware and utensils are used to prepare and serve non-vegetarian and vegetarian food. IMCC can and does provide special diet meals on styrofoam "clamshell" trays or containers with disposable plastic utensils (typically a "spork") instead of on reusable trays in an effort to minimize contamination from contact with

religiously prohibited foods. (Tr. [27] at 78-79, 82; *see* Ex. 4). Directions for a special diet are ordered for an inmate on a "tray ticket." (*See* Ex. 4). The ticket is sent to the kitchen where inmate food service workers prepare the food tray. (Tr. [27] at 83).

IMCC inmates may supplement their diets with purchases from the prison commissary, if they have money to do so. (Tr. [27] at 83). The commissary has an extensive stock of items, from snack foods such as chips and candy, to food which can be heated with hot water, noodles, pre-cooked rice, and the like. (*Id.*)

Following his conviction Mr. Patel was incarcerated first at IMCC for about forty-five days. He requested a diet in conformance with his religion's requirements but, apart from some bananas, nuts and raisins, was given the regular food tray. (Tr. [27] at 14-15). Mr. Patel was transferred to ASP where he stayed until 2008. (*Id.* at 15-18). There too he was given the regular diet. Mr. Patel filed a grievance which did not accomplish much. He was told to eat whatever he could eat from the main chow line, to avoid what he could not eat and he would be given snacks containing fruit. (*Id.* at 16, 18). Mr. Patel's testimony is not very clear, but apparently at some point ASP accommodated his diet for about four months before he was told again to use the regular chow line supplemented with fruit for a snack. (*Id.* at 18). Eventually Mr. Patel went on a hunger strike, apparently in 2008. (*Id.* at 18).

That year he was moved to the Iowa State Penitentiary at Fort Madison for a few weeks, where he continued his hunger strike, and then on to IMCC.[2] (*Id.*)

After he spoke with IMCC medical personnel, Mr. Patel was given his diet for approximately ninety days. (Tr. [27] at 20). Mr. Patel testified prison officials told him his food would be prepared using separate cookware. (*Id.*) However, when he asked an inmate food service worker about this, he was told his food was prepared with everyone else's, just placed on a styrofoam tray. (*Id.*) Mr. Patel complained and went on a hunger strike again. (*Id.* at 21). He says IMCC told him he would be given food he could eat. (*Id.*) Ultimately, at some point in 2010, Mr. Patel spoke with Deputy Warden Ort about his religious dietary needs. According to Mr. Patel, Mr. Ort said prison staff was talking with the kitchen to provide Mr. Patel's requested diet. (*Id.* at 22). Since 2010 Mr. Patel has received a vegetarian diet served to him in his cell or living unit on a styrofoam "clamshell" tray with the disposable spork. (*Id.* at 37, 79; *see* Ex. 4).

Exhibit 4 consists of tray tickets with directions for the meals which were to be provided to Mr. Patel over an approximate eight-day period in September 2011. According to Mr.

---

[2] In December 2008 Dr. Bruce Sieleni, the IDOC Mental Health Director, unsuccessfully sought civil commitment of Mr. Patel for mental health treatment, citing to his hunger strikes, among other problems. (Ex. 2).

Patel these tray tickets typify the meals he has received since 2010. The "comment[]" on each ticket advises: "Vegetarian diet, per religious beliefs." Breakfast is usually a cereal, bread, margarine, something called "drink base" and skim milk. The tickets for the lunch and supper meals contain more detailed instructions. For example, on the supper ticket for September 27 items "Ground Beef Pattie," "Tater Tots," "Brussel Sprouts," "Rinsed Pears," and "Hamburger Bun" are crossed out and handwritten substitutions made for a bowl of cold beans, baked potato, a whole unpeeled carrot, a bowl of fruit, and two cheese slices. Over the course of the period represented in Exhibit 4, crackers, cereal bars, a whole tomato or green pepper "if available," and one or two tablespoons of peanut butter were on the lunch or supper tickets. Because of his diabetes Mr. Patel also receives two snacks each day, juice and whole fruit in the first snack, and a cereal bar, juice and apple in the second. (Tr. [27] at 36-37).

    The problem is that many items on the lunch and supper tickets either do not arrive or Mr. Patel cannot eat them. He rarely receives the tomato or green pepper. (Tr. [27] at 26). Baked potatoes often arrive undercooked or raw. (*Id.* at 31). He does not eat bowls of beans or fruit because they are held in containers or served with utensils which are contaminated. (*Id.* at 25, 37-39). For the same reason he does not eat bread or buns. (*Id.* at 25, 34, 36). Mr. Patel does not eat the peanut butter because it is not

prepackaged, but rather is doled out in the kitchen using a spoon or scoop which has been in contact with other "unclean" food items. (*Id.* at 24; *see* Ex. 2 at 2). The cereal bars are forbidden because they contain eggs. (Tr. [27] at 30). The result has been that Mr. Patel is often unable to eat much of the food provided on his meal trays, particularly at lunch and supper. Returning to the example above, faithful to the BAPS dietary restrictions, at supper on September 27 Mr. Patel would have eaten the baked potato if cooked, the carrot and the cheese slices, but could not consume the bowls of beans and fruit. To supplement his diet Mr. Patel buys mixed nuts, cereal, precooked rice and corn, chips and cheese from the commissary. (*Id.* at 43-45).

Mr. Patel's descriptions of the food he has received since 2010, its condition, and likely contamination of some items from preparation, storage, and handling are uncontradicted in the record. The Court infers from the record, and there does not appear to be any dispute about the fact, that Mr. Patel has complained about the perceived shortcomings in his diet described above in meeting his religious dietary restrictions. He has gone on hunger strikes -- at least three at IMCC -- in an effort to draw attention to his complaints, has submitted grievances, and frequently complained informally. It is evident Mr. Ort, Mr. Patel's correctional counselor, Tom Arras (who testified), and probably other prison officials view Mr. Patel as demanding and manipulative.

Mr. Patel requests the Court order he be provided the following diet:

<u>Breakfast</u>
2 bowls of Honey Nut Cheerios
1/2 bowl of raisins
1/2 bowl of almonds
1 fresh fruit
2 - 4 oz. container of juice

<u>Lunch</u>
1 fresh fruit
1 bag of chips
1/2 bowl of raisins
1/2 bowl of almonds
1 cup cottage cheese
2 - 4 oz. container of juice
2 bags carroteenies

<u>Dinner</u>
1 fresh fruit
1 bag of chips
1/2 bowl of raisins
1/2 bowl of almonds
1 cup cottage cheese
1 whole tomato or green pepper or cucumber
2 - 4 oz. container of juice

<u>A.M. & P.M. and HS Snack</u>
1 fresh fruit; 1 bag of chips
2 - 4 oz. container of juice

(Ex. 8).

Deputy Warden Ort testified that the institution attempts to "reasonably accommodate religious diets" but "[w]ithin that, those diets have to . . . meet the nutritional standards." (Tr. [27] at 86). At one point Mr. Ort sent an email to three Hindu authorities asking about Mr. Patel's assertion that cookware and utensils which come into contact with meat must not be used in the preparation of his meals. One of these responded, indicating if the

kitchenware and utensils were sanitized after each use that would be a satisfactory accommodation. (*Id.* at 86-87). The Court has no basis to assess the authenticity or credibility of this information and accepts Mr. Patel's testimony on the subject. His testimony is supported by a letter from a BAPS representative which Mr. Patel has provided to IMCC officials. (Ex. 1).

Providing packaged food like peanut butter and baby carrots is an expense issue for the prison. Mr. Ort also said fresh fruit poses a problem, though he did not explain why and the prison has supplied fresh fruit to Mr. Patel and other inmates. (Tr. [27] at 84, 90-91). When asked if IMCC could provide "extra items to supplement whatever is provided" on Mr. Patel's tray, Mr. Ort responded that, subject to staying within nutritional values, "the administration and the institution would not have a problem with that." (*Id.* at 82).

IMCC has a five and one-half acre garden in which vegetables are raised. The garden is a source of fresh food beyond what is available from the central warehouse. (Tr. [27] at 93).

## II.

### DISCUSSION WITH ADDITIONAL FINDINGS

#### A.

RLUIPA applies a strict scrutiny standard to the review of prison regulations or practices which substantially burden an inmate's exercise of his religious beliefs. Its mandate is simple:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person --
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The inmate must show, "as a threshold matter, that there is a substantial burden on his ability to exercise his religion." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009)(quoting *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir.), *cert. denied*, 543 U.S. 991 (2004)(citing 42 U.S.C. § 2000cc-2(b))); *see Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009); *cert. denied sub nom Reisch v. Sisney*, 130 S. Ct. 3323 (2010)(quoting *Singson*); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). With some modification in light of RLUIPA's admonition that "religious exercise" means "*any* exercise of religion whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A)(emphasis added), the Eighth Circuit has borrowed from First Amendment case law holding

> . . . that to demonstrate a substantial burden on the exercise of religion, a government policy or action "'must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.'"

*Van Wyhe*, 581 F.3d at 656 (quoting *Patel*, 515 F.3d at 813 & n.7 (in turn quoting *Murphy*, 372 F.3d at 988)). There can be no substantial burden unless the inmate's asserted beliefs are both religious in nature and sincerely held. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005); *Patel*, 515 F.3d at 813 n. 7. An inmate must be afforded a "reasonable opportunity to engage in religious activities . . . ." *Van Wyhe*, 581 F.3d at 657. This would include, as the Eighth Circuit has recently said in the First Amendment context, "'reasonable accommodation of [an inmate's] religious dietary needs.'" *Sisney v. Reisch*, 674 F.3d 839, 846 (8th Cir.), *cert. denied*, 133 S. Ct. 359 (2012)(quoting *Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000)).

**B.**

Two aspects of Mr. Patel's RLUIPA claim should be addressed at the outset: damages and access to special foods on Hindu holy or festival days.

Mr. Patel is not entitled to recover damages from any defendant. The evidentiary record does not support a factual finding that the conduct of any of the persons named as defendants caused Mr. Patel a deprivation of rights under RLUIPA so as to be individually liable in damages. Their involvement was minimal, if any, and to the extent referred or alluded to in Mr. Patel's testimony, the evidence is too limited, conclusory and/or incomplete to support a damages award.

The legal basis for RLUIPA damages is also questionable. Damages against the IDOC, a state entity, or the individuals in their official capacities for a violation of RLUIPA is barred by Eleventh Amendment sovereign immunity.[3] *Van Wyhe*, 581 F.3d at 654-55. Because the constitutional authority for RLUIPA is derived from the Spending Clause in Article I of the U.S. Constitution, it has been held a prison official is also not liable in his or her individual capacity for a RLUIPA violation. *See Sisney v. Reisch*, 533 F. Supp. 2d 952, 968 (D.S.D. 2008)("Congress cannot use its Spending Power to subject a non-recipient of federal funds, including a state official acting [in] his or her individual capacity, to private liability for monetary damages," quoting *Smith v. Allen*, 502 F.3d 1255, 1272-75 (11th Cir. 2007)(a RLUIPA case)), *aff'd in part, rev'd in part on other grounds*, *Van Wyhe*, *supra*; *Jones v. Hobbs*, 2010 WL 3909979, at *5 & n.2 (E.D. Ark. 2010); *see also Van Wyhe*, 581 F.3d at 655 n.6 (citing *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610-11 (8th Cir. 1999)).

At the evidentiary hearing Mr. Patel asked the Court to order that he be allowed to receive special foods from a Hindu temple to be eaten on holy days twice a month and on certain festival days. The subject was only briefly addressed in the evidence, and came up as an afterthought on re-direct examination of Mr. Patel. (Tr. [27] at 70).

---

[3] At the evidentiary hearing counsel agreed that damages could not be recovered from IDOC. (Tr. [27] at 5).

Mr. Patel testified he discussed the subject once with the IMCC chaplain (presumably Mr. Yoder) who said something about arrangements not having been made with a religious leader. (Tr. [27] at 72-73). Mr. Patel did not follow up on his conversation with the chaplain from which the Court infers he did not pursue the matter any further. (*Id.* at 73). Access to special foods on Hindu holy or festival days was not sought in Mr. Patel's pro se Complaint [5]. There is no indication Mr. Patel has attempted to make arrangements with a Hindu temple to receive special foods or, it follows, that he has been refused special foods which a temple or other donor was prepared to send to him. He did not say what the special foods would be.

Prison officials are, of course, entitled to an opportunity to consider a specific request for special foods to be brought in from outside the institution with knowledge of what the foods would be, who would be involved, and how and when they would be consumed. In the circumstances described the Court does not believe the holy day special foods issue is properly before the Court. In any event, the brief evidence in the record does not support a finding either that special foods of religious significance from outside the institution have been denied to Mr. Patel, or that a substantial burden on his religious exercise has resulted.

## c.

Mr. Patel is a sincere adherent to the BAPS sect of the Hindu religion. The dietary needs to which he testified are religious in nature. Stated differently, Mr. Patel's "religiosity" as a basis for the dietary accommodations he seeks is authentic. *Cutter*, 544 U.S. at 725 n.13. Defendants question Mr. Patel's sincerity on two grounds, neither of which is persuasive. Following a bench trial Mr. Patel was convicted of attempted murder and stalking. *State v. Patel*, 741 N.W.2d 822, 2007 WL 2710831, at *2 (Iowa App. 2007)(Table Case). Mr. Patel testified that part of the Hindu belief system is that a person should not commit a crime, and if a person commits a crime the person is disqualified from being a Hindu, in a sense is self-excommunicated from the faith. (Tr. [27] at 56-57). Defendants argue Mr. Patel's convictions mean he cannot claim to be a Hindu. Mr. Patel, however, denies he committed the crimes of which he was convicted. (*Id.* at 56). More broadly, if conviction for a serious crime was a litmus test for religious sincerity, few in prison could claim the right to religious exercise.

Defendants also urge that the fact Mr. Patel is concerned solely with obtaining the diet he says is religiously mandated, and does not complain about otherwise being unable to exercise his religion, indicates a "lack of sincerity on actual faith issues, and that the diet itself is a lifestyle choice." (Def. Post-T. Br. [32]

14

at 5). The Court does not agree. That Mr. Patel has only one complaint about the ability to exercise his religious beliefs at IMCC and is otherwise content is, if anything, probative of sincerity.

   Mr. Patel and defendants seem in basic agreement about what the problem has been in accommodating Mr. Patel's religious diet. Mr. Patel testified the reason he cannot eat many of the food items he is given is not because of the food itself, but because of the way it is prepared by coming into contact with "contaminated" cookware and utensils. (Tr. [27] at 58). In their post-trial brief defendants articulate essentially the same thing; the problem "is not so much providing Patel with the items [he requests], but in the implementation." (Def. Post-Trial Br. [32] at 6). Both are right. IMCC has not refused to provide Mr. Patel with the diet he requests. The institution has, off and on, attempted to accommodate him as prison officials understood his dietary restrictions to be, often in response to his hunger strikes. The fact is, however, that at least since 2010 Mr. Patel has often not been able to eat many of the food items given to him on his meal trays because of the way the food is prepared and served, and has not been regularly provided with the raw, unpeeled vegetables, fruits and nuts he says would be sufficient. Mr. Patel's religious dietary needs have therefore only partially and inconsistently been accommodated despite his requests and complaints. He has had to resort to commissary purchases to

obtain adequate food he can consume. The lack of a consistently provided, sufficient religious diet has significantly inhibited Mr. Patel's religious conduct by impairing adherence to his religious dietary restrictions, resulting in a substantial burden on his religious exercise.

Defendants do not articulate a compelling state interest to support the present state of affairs. There was reference in the testimony to concern that trying to accommodate an individual inmate's special dietary requests would encourage other inmates to seek the same. Plaintiff's version of a vegetarian diet featuring uncooked foods other than a baked potato is unlikely to have much appeal to other inmates. Beyond this, IMCC is experienced in accommodating special dietary needs, both medical and religious. As its name implies IMCC is also a medical center where inmates with special needs are housed.

There was also a brief reference in the testimony to the cost of providing such things as pre-packaged peanut butter and "carroteenies." Cost is a legitimate concern, but defendants did not offer any evidence that accommodating Mr. Patel's dietary requests would involve any significant additional cost.

The Court concludes Mr. Patel has established a violation of his RLUIPA religious exercise rights as a result of IMCC's failure to consistently, within reason, accommodate his religious dietary needs. As noted, only equitable relief is available as a remedy.

**III.**

**RELIEF**

In view of the history of Mr. Patel's difficulties in obtaining a diet which fully accords with his religious beliefs, the exercise of his religion in this regard is likely to continue to be burdened without the compelled commitment of a decree requiring that a reasonable effort be made to accommodate Mr. Patel's religious dietary needs.

The Court recognizes, and Mr. Patel should as well, that IMCC can do no more than make a reasonable effort to accommodate his religious diet, including reasonable precautions against contamination of Mr. Patel's food by contact with cookware and utensils which have been used with food prohibited to him.[4] In a system where fellow inmates handle and serve the food, perfection on this score is too much to expect. There is, however, no indication what if anything inmate kitchen workers may have been told about handling food destined for Mr. Patel. Until the hearing in this case the Court doubts IMCC fully understood why Mr. Patel was unable to eat the bowls of canned fruit and beans, and servings of peanut butter, repeatedly given to him. Defendants suggest that rather than simply not eating these items or throwing things like

---

[4] The Court notes contamination is not a problem with the raw, unpeeled fruits and vegetables Mr. Patel seeks as a part of his diet because he eats the food after peeling off the contaminated skin.

cereal bars away, it would be helpful if Mr. Patel would address problems with prison staff. There has been an obvious communication problem. Mr. Patel's way of expressing himself is through demands and hunger strikes which have with some justification led the prison administration to regard him as manipulative, a perception which is not conducive to communication. Language may also be an issue. Mr. Patel has some difficulty expressing himself as the transcript may reveal. The development of a court-ordered dietary plan for Mr. Patel going forward may provide an opportunity for the communication between Mr. Patel and prison staff which defendants seek.

In recent cases involving kosher diets with similar contamination concerns the Court has directed the defendant institution to propose a dietary plan to provide the plaintiff with kosher food including reasonable precautions against contamination from contact with non-kosher food. *See Soboroff v. Ort*, 4:09-cv-00339, Report and Recommendation [216] (S.D. Iowa 2012); *Walker v. Kautzky*, 4:03-cv-40038, Report and Recommendation on Remand [140] (S.D. Iowa 2010). This process worked well in *Walker* and was on course to do the same in *Soboroff* before that case became moot. As in those cases, it is appropriate to give defendants an opportunity to propose a plan to accommodate Mr. Patel's religious diet to be incorporated in a final judgment rather than to impose Mr. Patel's requested diet whole cloth.

Equitable relief awarded should lie against only IDOC and IMCC Warden Craig. The other defendants should be dismissed.

## IV.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED that the Court find and order as follows:

(1) Mr. Patel has established that IMCC's failure to consistently provide him with daily vegetarian meals which accord with his sincerely held Hindu beliefs has substantially burdened the exercise of Mr. Patel's religion, a burden which has not been shown to be in furtherance of a compelling governmental interest, resulting in a violation of Mr. Patel's rights under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc-1, *et seq.*;

(2) If this report and recommendation is approved then IDOC should be ordered to within thirty (30) days present a plan to provide Mr. Patel with a nutritionally adequate vegetarian diet consisting of foods which are not, and have not been in contact with, meat, fish, eggs, onions or garlic, or cookware or utensils which have been "contaminated" by coming in contact with these foods. The plan should include reasonable precautions against such contamination;

(3) Following review of the proposed plan and Mr. Patel's response, if any, the undersigned should be directed to make a

further recommendation for entry of a final judgment for appropriate declaratory and injunctive relief.

IT IS ORDERED the parties have until **March 7, 2013** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 15th day of February, 2013.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE